UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-60099-CR-ZLOCH

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BRADLEY BIRKENFELD,

        Defendant.

_____/

### **SENTENCING MEMORANDUM OF DEFENDANT BRADLEY BIRKENFELD**

### **Introduction**

The defendant Bradley Birkenfeld respectfully submits this Sentencing Memorandum in support of the imposition of a sentence that reflects the unique circumstances of this case: the defendant's own initiation of the federal investigation that ultimately led to the indictment against him, the defendant's timely (if not immediate) acceptance of responsibility, the extraordinary pre- and post-indictment assistance and cooperation that the defendant has provided to the United States Government, and the unprecedented results of that assistance and cooperation.[1] See Letters of Senator Carl Levin, Chairman of the United States Senate Permanent Subcommittee on Investigations, Robert Khuzami, Director of the Division of

---

[1] Indeed, at Mr. Birkenfeld's Initial Appearance before the Honorable United States Magistrate Judge Seltzer on May 13, 2008, one of the Government prosecutors advised the Court, "Your Honor, what I would submit to the Court is *a little bit unusual about these circumstances*. It is that *Mr. Birkenfeld has been talking to the Government for a period that well exceeds a year*." See Transcript of Initial Appearance and Bond Hearing, at pp. 5-6 (pages not numbered, emphasis supplied), attached to accompanying Appendix as Exhibit A. Shortly thereafter, during the course of Mr. Birkenfeld's plea colloquy before this Court on June 19, 2008, another of the Government prosecutors emphasized to the Court, "[w]ith respect to Mr. Birkenfeld's cooperation I would just like to add for the record that *Mr. Birkenfeld's cooperation is anticipated to assist the Government nationwide in its investigation*, and the decision with respect to his 5K1 will not only be made by the local U.S. Attorney's Office but by the Department of Justice Tax Division". See Transcript of Plea Colloquy, p. 20 (emphasis supplied), Appendix Exhibit B.

Enforcement of the United States Securities and Exchange Commission, and John C. McDougal, Esquire, Office of the Chief Counsel of the United States Internal Revenue Service.  Appendix Exhibits C, D, and E, respectively.

Mr. Birkenfeld respectfully submits that this Honorable Court ought to grant the Government's U.S.S.G. § 5K1.1 Motion and depart downward to a sentence within Zone B of the Sentencing Guidelines.  Upon a careful consideration of the factors set forth in U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(a), Mr. Birkenfeld submits that the imposition of a sentence of five (5) years probation, to include as a special condition that he be placed in home detention for an appropriate period of time, U.S.S.G. § 5C1.1(c), would be fair and reasonable and would ensure that the defendant's punishment is sufficient, but not greater than necessary.  18 U.S.C. § 3553(a); United States v. Williams, 435 F.3d 1350, 1353-1356 (11th Cir. 2006).

## General Background

In October, 2001, Mr. Birkenfeld began working at UBS in Geneva, Switzerland, handling private banking, primarily for clients located in the United States.  By 2005, Mr. Birkenfeld realized that UBS and he were acting improperly in their handling of UBS banking clients, including Mr. Birkenfeld's own clients.

Over the next three years, Mr. Birkenfeld voluntarily undertook affirmative actions -- at great personal and professional risk -- to initiate contact with and to provide sensitive, detailed information about such misconduct to his superiors and to his Government, first internally at UBS in Switzerland and then (despite long-standing Swiss banking secrecy laws) in the United States, his home country.  In the end, the results of Mr. Birkenfeld's efforts were clear for all to see.

On June 30, 2008, United States authorities sought judicial authorization in the State of Florida to compel UBS to disclose the names of those American clients who had violated the law by not reporting and withholding taxes associated with monies maintained in offshore accounts. The following month, in July, 2008, UBS agreed to "exit entirely" the Swiss offshore banking business for U.S. clients.

In February, 2009 -- following the July, 2008 issuance of a "John Doe" summons that was based in significant part upon the information that Mr. Birkenfeld had provided to the IRS in June, 2007 -- UBS entered into an historic Deferred Prosecution Agreement with the Government. The Agreement could result in the release of the names of as many as 19,000 U.S. citizens in regard to their taxable assets being held by UBS (with an estimated value of $20 billion) and a penalty of $780 million for UBS to avoid criminal prosecution. In addition, UBS has recently settled outstanding issues with the IRS's "John Doe" summons concerning the disclosure of UBS client names.

None of these events would have occurred had Mr. Birkenfeld not (i) discovered and disclosed his concerns about UBS's private banking policies to UBS in 2005 and 2006, (ii) voluntarily contacted U.S. authorities, including the Department of Justice (DOJ), the Internal Revenue Service (IRS), the Securities and Exchange Commission (SEC), and Congress in 2007, (iii) voluntarily shared extensive privileged information about improprieties at UBS during six trips from Switzerland to the U.S and some eight different meetings with U.S. authorities, (iv) publicly acknowledged and accepted his own responsibility by pleading guilty within weeks of being charged himself in 2008, and (v) cooperated fully and completely with Government prosecutors to this day.

**Consideration of Mr. Birkenfeld's Assistance and Cooperation**

**A.     Mr. Birkenfeld's Discovery of Wrongdoing at UBS, Resignation, and Whistleblowing Claims in Switzerland**

After starting work at UBS in October, 2001, Mr. Birkenfeld performed well; he generated positive employment reviews and was titled as a Director. In May, 2005, Mr. Birkenfeld noticed a three-page legal document on UBS's internal company computer system that contained prohibitions completely at odds with UBS's *actual* banking practices with its U.S. clients. That same day, Mr. Birkenfeld notified his immediate superiors at UBS of the issue; the next month, in June, 2005, he formally brought the matter to the attention of certain high-ranking officials at UBS who were responsible for compliance and legal matters and pressed for clarification. Receiving none, Mr. Birkenfeld resigned within four months, in October, 2005.

Upon his resignation, UBS sent Mr. Birkenfeld threatening letters reminding him of his legal obligations under "bank/client confidentiality" and that he may be subject to prosecution if he disclosed or provided "client data" to anyone. In early 2006, when UBS refused to honor a bonus award that had been due to Mr. Birkenfeld, he invoked his rights under Swiss law and UBS's three internal procedures as a whistleblower in response to the apparent retaliation against him. Mr. Birkenfeld and UBS eventually entered into a severance agreement over the disputed bonus. More significantly, after Mr. Birkenfeld voiced his complaints in writing, UBS revised its internal practices by removing the three-page memorandum from its internal computer system and prohibiting its Swiss bankers from traveling to the United States.

**B. Mr. Birkenfeld's Pre-Indictment Assistance to the US Government**

In early 2007, while his employment dispute with UBS was being resolved, Mr. Birkenfeld -- through prior counsel -- voluntarily contacted the IRS, as well as the DOJ, and offered to provide authorities at both agencies with various sensitive information

regarding UBS and its private banking practices. Through counsel, Mr. Birkenfeld repeatedly sought full immunity from potential prosecution.

After agreeing to a proffer session that did not include full immunity, Mr. Birkenfeld voluntarily met with DOJ prosecutors and an IRS Special Agent on June 12, June 19, and June 21, 2007. During the course of those three full-day meetings at the DOJ in Washington, Mr. Birkenfeld provided Government authorities with extensive information, privileged documents, and investigative strategies about UBS's massive tax fraud scheme.

On October 12, 2007, Mr. Birkenfeld was again interviewed extensively by two additional IRS agents regarding the same subject matter. See generally, Letter of Mr. McDougal, Appendix Exhibit E.

In November, 2007, Mr. Birkenfeld initiated contact with U.S. Senate investigators and voluntarily provided them with sworn testimony, privileged documents, and various other materials. See generally, Letter of Senator Levin, Appendix Exhibit C. Following its public hearings in July, 2008, the U.S. Senate Permanent Subcommittee on Investigations issued a Report on Swiss banking secrecy entitled "Tax Haven Banks and U.S. Tax Compliance" in which Mr. Birkenfeld's deposition testimony is recognized and acknowledged. See Excerpts of Senate Report, Senator Levin statement at pp. 4-5, Appendix Exhibit F. [2]

---

[2] Mr. Birkenfeld is the only UBS employee to have provided the Subcommittee with detailed, inside information concerning UBS's activities. See Exhibit Nos. 84-94 to the July 17 and July 25, 2008 Hearings Before the Investigations Subcommittee of the U.S. Senate Committee on Homeland Security and Governmental Affairs (materials that were provided by Mr. Birkenfeld to the Subcommittee), attached as Appendix Exhibit G. Martin Liechti, the Managing Director responsible for the division in which Mr. Birkenfeld worked at UBS, was called as a witness at the July, 2008 hearings, but invoked his 5th Amendment rights and refused to testify. Two weeks later, Mr. Liechti, was released by U.S. authorities, apparently with no charges having been issued against him. Id.

In November, 2007, Mr. Birkenfeld also initiated contact with the U.S. Securities and Exchange Commission and provided similar information, sworn testimony, and various materials to the Enforcement Division of that agency.  See generally, Letter of Director Khuzami, Appendix Exhibit D.

Simply stated, the nature and extent of the information that Mr. Birkenfeld provided to each of these Government authorities was *unprecedented*:

- An overview of UBS's cross-border and offshore business activities;

- The UBS offices and private bankers that were directly involved;

- The volume and size of UBS accounts for its U.S. customers;

- UBS's internal accounting reports, training techniques, and presentations;

- Details on the frequency and location of UBS's bankers' travels to the U.S.;

- Urging Government authorities to have UBS's bankers cross-matched when traveling through U.S. Customs;

- Details concerning the lack of adequate U.S. licensing by UBS bankers to provide investment advice to clients;

- The failure of UBS to abide by the Qualified Intermediary and Deemed Sales regulatory guidelines; and

- Copies of internal UBS documents, e-mails, and memoranda corroborating the information being provided by Mr. Birkenfeld.

Each of these meetings with the Government and the disclosure of all of this information to the various U.S. authorities took place well *before* Mr. Birkenfeld was himself charged by the Government in this case.[3]

---

[3]   Significantly, among other information Mr. Birkenfeld voluntarily provided to the SEC and U.S. Senate was the name of his largest U.S. client: Igor Olenicoff.  In October, 2007, Mr. Olenicoff entered into a plea agreement with federal prosecutors in the Central District of California on a single charge of tax fraud, pursuant to which he agreed to pay $52 million in back taxes and was sentenced to two (2) years probation.  See PSR at ¶¶ 8 and 42; United States v. Olenicoff, Case No.: 8:07-cr-00227-CJC-1.

### C.  Mr. Birkenfeld's Post-Indictment Assistance and Cooperation

In April, 2008, based in large part upon Mr. Birkenfeld's alleged failure to be totally forthcoming about his own conduct at UBS during his meetings with DOJ prosecutors, the Government sought his indictment. In May, 2008, he traveled to the U.S. from Switzerland, where he was still residing, in order to attend additional pre-arranged meetings with the SEC and U.S. Senate, as well as for a high school reunion. When his plane landed in Boston, Mr. Birkenfeld was placed under arrest by federal agents.

Within weeks of his Initial Appearance, Mr. Birkenfeld pleaded guilty and agreed to continue his cooperation with the Government. Mr. Birkenfeld's continued cooperation has led directly to further action by the Government in numerous related investigations and prosecutions. In November, 2008, the Government indicted Raoul Weil, the Chairman of UBS's Wealth Management business. In December, 2008, the U.S. reportedly expanded its inquiry to include other banks, such as Credit Suisse and HSBC.

In February, 2009, following the settlement with the U.S., Marcel Rohner, UBS's Chief Executive Officer, resigned. In March, 2009, the Chairman of UBS, Peter Kurer, resigned, as did Martin Liechti, see n. 2, supra, under circumstances reported to be closely tied to their alleged connections to UBS's illegal activities in the US. In April, 2009, at a meeting of the "Group of 20," the Government of Switzerland agreed to relax bank secrecy rules and cooperate with other countries by providing more tax transparency in its exchanges of customer information.

In April, 2009, the U.S. Government indicted two UBS clients here in Florida, both of whom have already pled guilty. In July, 2009, a third UBS client was indicted in

Florida; he too has already pleaded guilty. Earlier this month, a fourth UBS client was indicted in California.

Indeed, earlier this year, Douglas Shulman, the Commissioner of the IRS, testified to the United States Senate that:

> Informants are another part of IRS' enforcement net,.... [Informant tips] involve the names and practices of financial institutions in those countries that typically have strict bank secrecy laws, and keep in mind that the value here is far greater than just the names of specific individuals. With additional development, these tips provide information that can lead to a John Doe summons – our next important tool.

See Testimony of Commissioner Shulman to Congress, March 4, 2009, Appendix Exhibit H. See also Commissioner Shulman's Announcement of the IRS Voluntary Disclosure Program, in which he stated that "[t]hose who truly come in voluntarily will pay back taxes, interest, and a significant penalty, *but can avoid criminal prosecution*" (emphasis supplied), Appendix Exhibit I.

Mr. Birkenfeld respectfully submits that this is precisely the same type of "valuable information" that he voluntarily provided not only to the IRS, but to the DOJ, the SEC, and Congress, long before he was ever indicted.

**Consideration of Section 3553(a) Factors**

    A.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

Mr. Birkenfeld fully recognizes and acknowledges that what he did as an employee of UBS was wrong. At the same time, Swiss banking procedures had been a historic fact and deep-rooted secrecy was such a powerful element of Swiss law that Mr. Birkenfeld did not properly comprehend or question that which had long been standard operating procedure at his place of employment. Beginning in May, 2005, however, he

did, and over the next several years he undertook a series of affirmative actions to bring his concerns to the attention of the authorities, first those at UBS and then those throughout the U.S. Government.

While it does not excuse his own conduct, Mr. Birkenfeld's role as the first known Swiss private banker to "peel back the curtain" in what has become an international financial scandal over Swiss private banking is in many ways *sui generis*. Indeed, his own pre-indictment actions in coming forward to authorities in 2005, 2006, and 2007 reflect an individual genuinely attempting to shine light on a broader systemic problem, not someone trying to avoid or hide responsibility.

**B.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A sentence of five years probation, a special condition of which is an appropriate period of home detention -- in addition to the past 15 months in which Mr. Birkenfeld has been subject to a curfew, supervision, and electronic monitoring (in the form of an ankle bracelet) -- will serve as a constant and daily reminder to Mr. Birkenfeld of his conduct and the need to act in accordance with the law. The U.S. has recovered the financial damages in this case from Mr. Olenicoff, who, as part of his plea agreement, paid some $52 million in back taxes on the monies at issue. See PSR at ¶ 42. Moreover, as a result of Mr. Birkenfeld's assistance, the Government has derived even greater benefits, including those associated with the recent UBS settlement and the revisions to Swiss banking practices, as well as the ongoing voluntary disclosures to the IRS by U.S. clients of UBS and other banks. As such, a five-year period of probation, together with a term of home detention, would be a just sentence for Mr. Birkenfeld.

**C.     The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct**

Mr. Birkenfeld, who in early 2008 was unknown to anyone except family and friends, has gained international notoriety as a result of his indictment and guilty plea.[4] This infamy already serves as a deterrent to others in the financial services field and elsewhere.

Given his efforts to bring attention to the conduct of UBS and, ultimately, his own participation in it, Mr. Birkenfeld submits that a period of imprisonment is not necessary to further the goal of deterrence. Such a punitive measure might adversely affect the willingness of others to come forward with similar information.

### D. The Need for the Sentence Imposed to Protect the Public From Further Crimes of the Defendant

Mr. Birkenfeld has no history of any relevant criminal conduct or behavior. Moreover, he has no future in his professional career. As an Economics major who obtained an MBA and who was trained in the areas of financial advice and wealth management, see PSR at ¶¶ 80-82, he has no future in financial services. Through counsel and by permission of the Court, in order to pay living expenses and legal fees he has liquidated most if not all of his overseas assets.

Mr. Birkenfeld's father described his son as a "person who is never one to shirk his responsibilities." See PSR at ¶ 64. He has complied fully with all conditions of pretrial release and pretrial probation, including his curfew and electronic monitoring. See PSR at ¶ 6. By agreement with the Government, he was permitted by Judge Seltzer to travel locally during the Christmas holidays; he complied fully without issue.

Mr. Birkenfeld has accepted and acknowledged his responsibility; his participation in the crime to which he has pleaded guilty is an anomaly in an otherwise law-abiding

---

[4] Today, well over a year since his guilty plea, the term "UBS" and "Birkenfeld" appears over 15,000 times on "Google," the popular internet search engine; the term "UBS", "Birkenfeld", and "guilty" appears in excess of 4,000 times.

life.  See generally, Personal Letters in Support of Mr. Birkenfeld, Appendix Exhibit J. The protection of the public does not require that Mr. Birkenfeld serve a period of imprisonment.

      **E.**     **The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The defendant submits that a sentence of five years probation would allow him to proceed with any appropriate correctional treatment, whether educational or vocational training, in the most effective manner.

### Conclusion

For the reasons set forth above, the defendant Bradley Birkenfeld respectfully submits that this Honorable Court ought to impose a sentence of probation for a period of five years, including as a special condition home detention for an appropriate period of time.  In the circumstances of this truly unique case, such a sentence reflects the considerations set forth in U.S.S.G. § 5K1.1 and is sufficient, but not greater than necessary to achieve the goals enunciated in 18 U.S.C. § 3553(a).

Respectfully submitted,

s/ **Robert W. Stickney**
Robert W. Stickney
Counsel for Defendant
One Financial Plaza
100 S.E. 3rd Avenue, Suite 2510
Fort Lauderdale, Florida  33394
Phone: (954) 767-8908 / Fax: (954) 767-8938
E-mail:  rwstickney@yahoo.com
Fla. Bar No. 883130

- and -

s/ **David E. Meier**
David E. Meier
Counsel for Defendant
Todd & Weld LLP
28 State Street, 31st Floor
Boston, Massachusetts  02109
Telephone: (617) 720-2626
Facsimile: (617) 227-5777
Email Address: dmeier@toddweld.com

Admitted *Pro Hac Vice*
Attorneys for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed by CM/ECF this 18th day of August 2009.

Respectfully submitted,

s/ **Robert W. Stickney**
Robert W. Stickney
Co-Counsel for Defendant
One Financial Plaza
100 S.E. 3rd Avenue, Suite 2510
Fort Lauderdale, Florida  33394
Phone: (954) 767-8908
Fax:    (954) 767-8938
E-mail:  rwstickney@yahoo.com
Fla. Bar No. 883130