# Exhibit F

S. Hrg. 110–614

# TAX HAVEN BANKS AND U.S. TAX COMPLIANCE

## HEARING

BEFORE THE

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

OF THE

COMMITTEE ON
HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS
UNITED STATES SENATE

OF THE

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

JULY 17 AND 25, 2008

Available via http://www.gpoaccess.gov/congress/index.html

Printed for the use of the
Committee on Homeland Security and Governmental Affairs

U.S. GOVERNMENT PRINTING OFFICE

44–127 PDF WASHINGTON : 2008

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC Washington, DC 20402–0001

Page
Footnote No. 493, *See Attachments (2)* ........ 1196, 1197
Footnote No. 495, *See Footnote No. 367 (above)* SEALED EXHIBIT ........ *
124. Correspondence between the Permanent Subcommittee on Investigations and Frank P. Lowy ........ 1198
125. Correspondence between the Permanent Subcommittee on Investigations and Joshua H. Gelbard ........ 1201
[*] Retained in the files of the Subcommittee.

# TAX HAVEN BANKS AND U.S. TAX COMPLIANCE

**THURSDAY, JULY 17, 2008**

U.S. SENATE,
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS,
OF THE COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 9:34 a.m., in Room SD–106, Dirksen Senate Office Building, Hon. Carl Levin, Chairman of the Subcommittee, presiding.

Present: Senators Levin and Coleman.

Also Present: Senator Kerry.

Staff Present: Elise J. Bean, Staff Director/Chief Counsel; Mary D. Robertson, Chief Clerk; Robert L. Roach, Counsel and Chief Investigator; Ross Kirschner, Counsel; Laura Stuber, Counsel; Zack Schram, Counsel; Gina Reinhardt, Congressional Fellow; Timothy Everett, Intern; Jeffrey Rezmovic, Law Clerk; Lauren Sarkesian, Intern; Spencer Walters, Law Clerk; Mark L. Greenblatt, Staff Director and Chief Counsel to the Minority; Michael P. Flowers, Counsel to the Minority; Clifford C. Stoddard, Jr., Counsel to the Minority; Timothy R. Terry, Counsel to the Minority; Adam Pullano, Staff Assistant to the Minority; Kelly Brannigan; Kathy Kerrigan (Senator Kerry), and Thomas Caballero, Senate Legal Counsel's Office.

## OPENING STATEMENT OF SENATOR LEVIN

Senator LEVIN. Good morning, everybody. About 50 tax havens operate in the world today. Their twin hallmarks are secrecy and tax avoidance. Some tax havens are little known places like Andorra and Vanuatu that few Americans have heard of. Others, like Switzerland and Liechtenstein, are notorious for operating behind an iron ring of secrecy. Billions and billions of dollars worth of U.S. assets find their way into these secrecy tax havens, aided by banks, trust companies, accountants, lawyers, and others. Each year, the U.S. Treasury loses up to $100 billion in tax revenues from offshore tax abuses. Tax havens are engaged in economic warfare against the United States and against honest, hard-working American taxpayers.

Today we will look at two banks that relied on secrecy and deception to hide not just the tax avoidance schemes of their clients, but the actions that they themselves took to facilitate U.S. tax evasion. The first bank is LGT, a private bank owned by the royal family of Liechtenstein. Liechtenstein is a tiny alpine nation whose 35,000

citizens would fill one-third of a good-sized football stadium. It has no airport, but supports 15 banks that together boast of holding more than $200 billion in assets. Liechtenstein also boasts of secrecy laws that are more stringent than even those that have made Switzerland synonymous with hidden bank accounts.

The second bank is UBS, a Swiss bank. It is one of the world's largest financial institutions, the world's largest manager of private wealth, and a public company of international renown. Yet, as we will hear today, UBS has an estimated 19,000 so-called undeclared accounts for U.S. citizens with an estimated $18 billion in assets that have been kept secret from the IRS.

Both LGT and UBS operate behind a wall of secrecy that this hearing and our report will show needs to come down. The evidence we have been able to obtain breaks through some of that wall of secrecy to show how these two banks have employed banking practices that facilitate, and have resulted in, tax evasion by U.S. clients.

We initiated this investigation into tax haven banks in February 2008, as a global tax scandal erupted after a former employee of LGT provided tax authorities around the world with data on about 1,400 people with accounts at LGT Bank in Liechtenstein. On February 14, 2008, German tax authorities, having obtained the names of 600 to 700 German taxpayers with LGT accounts, executed multiple search warrants and arrested a prominent businessman for allegedly using LGT accounts to evade $1.5 million in taxes. Soon after, our IRS announced that it had initiated enforcement action against about 100 U.S. taxpayers in connection with accounts in Liechtenstein. The United Kingdom, Italy, France, Spain, and Australia made similar announcements on the same day. Altogether since February, nearly a dozen countries have announced plans to investigate taxpayers with Liechtenstein accounts, demonstrating not only the worldwide scope of the tax scandal, but also a newfound international determination to fight against tax evasion facilitated by tax haven banks.

The former LGT employee who exposed LGT's dirty laundry had to go into hiding to avoid arrest by Liechtenstein which has listed him as its No. 1 target for arrest. A $10 million reward has been placed on his head by unknown parties on the Internet. This Subcommittee obtained about 12,000 pages of LGT documents related to U.S. clients from that former LGT employee. We also interviewed him and took his statement by videoconference, a tape of which, with precautions taken to obscure identifying details, will be presented during this hearing. His revelations are explosive.

The documents and information that he provided depict a bank that is a willing partner, and an aider and abettor, to clients trying to evade taxes, dodge creditors, or defy court orders. Internal LGT documents and other information show secrecy was a deeply embedded way of life at the LGT bank. LGT used code names for its clients and directed its bankers to use pay phones when contacting them. A LGT document instructed bankers trying to contact a client as follows: "CAUTION: Calls may be made only from public phone booths, preferably not from a [Liechtenstein] phone booth !!!" LGT set up secret, shell transfer corporations which clients could use to route money into and out of their LGT accounts, in order



to, in the words of LGT, "cover the tracks." LGT created elaborate, deceptive offshore structures, using foundations, trusts, and corporations, to hide a client's ownership of assets from tax authorities in other countries.

Our report presents seven case studies of U.S. clients using LGT services. Due to time constraints, we will discuss only four today. In preparation for this hearing, the Subcommittee served subpoenas on three of the four LGT clients seeking their personal appearance: Shannon Marsh, William Wu, and Steven Greenfield. Two of those individuals—Mr. Marsh and Mr. Wu—are here today. The third—Mr. Greenfield—has refused to appear after a subpoena was served on him, and we will be seeking enforcement of our subpoena. The fourth—Peter Lowy—left the country despite our request that he appear today. The Subcommittee notified his legal counsel that he would be subpoenaed to appear, if necessary. He has now agreed to appear before the Subcommittee at a continuation of this hearing a week from tomorrow.

Later in the hearing, when these individuals are called to give testimony, I will describe in more detail what we have learned about their Liechtenstein accounts, but for now I will mention each case history only briefly.

*Shannon Marsh.* Shannon Marsh is a son of the late James Albright Marsh, a U.S. citizen from Florida in the construction business who formed four Liechtenstein foundations in the 1980s and transferred substantial funds to them. Two of these foundations were formed for him by LGT Bank. By 2007, the assets in the four foundations had a combined value of $49 million. LGT instructed the Marshes to use the code "Friends of J.N." when they wished to "get in touch." The Marsh accounts were never disclosed to the IRS by LGT Bank.

*William Wu.* Mr. Wu is a U.S. citizen who has lived for many years with his family in New York. LGT helped Mr. Wu hide ownership of his house in New York by helping him arrange a fake sale to an offshore company that he secretly controlled. LGT also helped him withdraw substantial funds from his Liechtenstein account, ranging from $100,000 to $1.5 million at a time, in ways that made the funds difficult to trace.

*Steven Greenfield.* Harvey and Steven Greenfield, father and son, are New York businessmen who specialize in importing toys. In March 2001, in Liechtenstein, LGT Bank held a 5-hour meeting with the Greenfields, attended by three LGT private bankers and Prince Philipp, Chairman of the LGT Board of Directors and brother to the sovereign of Liechtenstein. The meeting was primarily a sales pitch to convince the Greenfields to transfer to LGT Bank about $30 million from a Hong Kong bank after "leaving behind as few traces as possible." Again, Mr. Greenfield has refused to appear despite service of a subpoena, so we will be pursuing that matter.

*Peter Lowy.* Peter Lowy lives in California. His father, with his sons' help, set up a LGT foundation in 1998, after telling the bank that he did not want Australian tax authorities to know about the assets. LGT took measures to hide the Lowys' ownership of the assets, including by keeping their name off the formation documents for the new foundation, routing incoming assets through an offshore transfer corporation to prevent a direct link to the new foun-

dation, and using a Delaware corporation headed by Peter Lowy to name the beneficiaries. In 2001, the Lowys dissolved the foundation and moved to Switzerland assets totaling about $68 million. Mr. Lowy will appear next week to answer questions about these matters.

The importance of these case studies is that they provide an inside look at what goes on behind the wall of secrecy that surrounds this Liechtenstein bank. And what does go on behind that wall? Banking practices that facilitate tax evasion—conduct that angers every honest American who pays taxes.

We have also managed to pierce some of the layers of Swiss secrecy that for too long have made Switzerland the place to bank for people with something to hide.

In late 2007, the Subcommittee took the deposition of Bradley Birkenfeld, who worked for more than 12 years as a private banker in Switzerland, including 4 years at the Geneva office of UBS. In 2008, Mr. Birkenfeld was charged and pled guilty to conspiring with a U.S. citizen, Igor Olenicoff, to defraud the IRS of $7.2 million in taxes owed on $200 million of assets hidden in secret accounts in Switzerland and Liechtenstein. In connection with this prosecution, the United States also detained, as a material witness, a senior UBS private banking official from Switzerland, Martin Liechti, then traveling on business in Florida. These enforcement actions appear to represent the first time that the United States has criminally prosecuted a Swiss banker for helping a U.S. taxpayer evade U.S. taxes. And Mr. Liechti is here today. I want to express my appreciation to the Justice Department and to the U.S. Attorney for the Southern District of Florida for making him available.

Our report describes how Mr. Birkenfeld signed up Mr. Olenicoff as a client, in part by traveling to California from Switzerland to meet him, and opened UBS accounts for him in Switzerland in the name of offshore corporations that Mr. Olenicoff controlled to hide his ownership of the assets. For a time, Mr. Olenicoff was Mr. Birkenfeld's largest client.

The details of their tax evasion scheme are sordid enough. But what Mr. Birkenfeld told the Subcommittee was that what he did as a private banker at UBS was ordinary practice. He told us about thousands of Swiss accounts at UBS for U.S. clients holding billions of dollars in assets, all undeclared. He also described the pressure placed on the Swiss private bankers to bring new money into the bank from the United States, called "net new money." His deposition with us and other documents show that each year, UBS assigns each private banker an annual net new money target. A January 2007 e-mail sent out by Mr. Liechti to the Swiss bankers in the Americas division wished them a happy new year, recounted how, in 2002, they had brought in 4 million Swiss francs per banker, how that number had quadrupled in 2 years to 17 million Swiss francs per banker in 2006, and then urged them to quadruple their efforts again in 2007 to bring in 60 million Swiss francs per banker in net new money from the Americas.

Mr. Birkenfeld told us that Swiss bankers regularly traveled to the United States to target U.S. citizens for net new money. He told us how these Swiss bankers maintained a low profile, using



business cards that did not mention "wealth management," sometimes declaring they were in the United States for non-business purposes, and carrying encrypted computers that, allegedly, even U.S. Customs agents could not read.

A Subcommittee analysis of travel records supplied by Customs corroborates the testimony. The travel records show that about 20 UBS Swiss bankers made about 300 trips to the United States since 2003, often traveling together to UBS-sponsored functions designed to attract wealthy potential clients. The travel records also show that some UBS private banking officials made regular U.S. visits, including Mr. Liechti who traveled to the United States up to eight times in a year. Mr. Birkenfeld described one Swiss banker who saw 30 to 40 clients on each U.S. visit. All this to sell Swiss secrecy on U.S. soil.

Mr. Birkenfeld also described UBS Swiss bankers who presented their clients with securities products and helped execute securities transactions here in the United States, without a broker-dealer license from the Securities and Exchange Commission. In response to Subcommittee inquiries, UBS also acknowledged that, like LGT, its bankers had set up foreign corporations to disguise the ownership of accounts by U.S. clients.

The Subcommittee even obtained a document showing that UBS provided its Swiss private bankers with training on how to detect surveillance by U.S. customs agents and law enforcement officers while traveling here. Think about that: A major international bank is training its bankers to detect surveillance by U.S. authorities.

UBS efforts targeting U.S. clients to open Swiss accounts were, in the words of Mr. Birkenfeld, a "massive machine." And the push to open Swiss accounts took place even though UBS had branch banking and securities operations in the United States that were large enough to accommodate all of its U.S. clients.

Which brings up a fundamental question. Why would a U.S. taxpayer open a UBS account in Switzerland when it could bank with UBS right here in the United States? Why would 19,000 U.S. clients with nearly $18 billion in assets choose to open up accounts in Switzerland? It seems plain that part of the answer is that they wanted to open undeclared accounts that the IRS would not know about. They wanted secrecy.

And UBS gave them secrecy. In November 2002, UBS sent a letter to all of its U.S. clients to reassure them that their secret Swiss accounts were still safely hidden, despite a new Qualified Intermediary program, or QI, going into effect. Here is what that UBS letter said in part:

"Dear client: From our recent conversations we understand that you are concerned that UBS' stance on keeping its U.S. customers' information strictly confidential may have changed. . . . We are writing to reassure you that your fear is unjustified and wish to outline only some of the reasons why the protection of client data can not possibly be compromised. . . ."

We all know what is going on here. U.S. clients who don't bank with UBS in the United States and instead bank with UBS in Switzerland are buying secrecy. And folks who buy secrecy have secrets they don't want to reveal, such as evading taxes, ducking creditors, or defying court orders. But those clients aren't the only

ones relying on secrecy to cloak their actions. Banks in tax havens, including the two banks under examination today, are also covering up their own actions—actions that they presumably didn't want to see exposed by media around the world.

We are putting up a chart that summarizes the Tax Haven Bank Secrecy Tricks that we have uncovered during this investigation:[1] Banks using code names for clients to disguise their identities; banks telling their bankers to use pay phones instead of business phones so authorities can't trace a call back to the bank; banks giving their bankers encrypted computers when they travel so tax authorities can't read any client information; banks funneling money through so-called transfer companies to cover the tracks of the funds and make audits difficult; banks opening accounts in the names of foreign shell companies to hide the real owners; banks setting up fake charitable trusts for the same reason; banks providing their bankers with countersurveillance training. The list goes on and on. These tricks are all about deception, all about making it impossible for the IRS to follow the money, to bring tax cheats to justice, and to bring back into the U.S. Treasury the tens of billions of dollars owed to Uncle Sam.

UBS has told the Subcommittee that it is changing its ways. It has banned travel by its Swiss bankers to the United States. It is encouraging U.S. clients to bank with UBS in the United States or at a subsidiary in Switzerland called Swiss Financial Advisors that requires all U.S. clients to disclose their accounts to the IRS. Liechtenstein tells us they are in negotiations with the United States to enter into a tax information exchange agreement and with its European neighbors to expand tax cooperation in connection with an anti-fraud agreement.

Well, I hope that is all true, but count me skeptical for a number of reasons. First, we haven't heard anything from LGT about reforms; it is not even here today, in contrast to UBS that is here today. Second, evading U.S. taxes is a billion dollar industry; it's gone on for decades; and the profits are huge, both for the tax cheats and for the banks that hold their assets. The documents and testimony that we are releasing today disclose a culture of secrecy and deception that we are determined to end, despite it being so strongly entrenched.

Tax evasion eats at the fabric of society, not only by starving health care, education, and other needed governmnent services of resources, but also by undermining trust—making honest folks feel that they are being taken advantage of when they pay their fair share.

Our report outlines a number of ways we can fight back to end tax haven abuses, and here are a few.

First, we should support the recent innovative enforcement actions taken by the Justice Department and IRS to prosecute foreign bankers who help U.S. taxpayers cheat Uncle Sam and to compel foreign banks to disclose the names of their U.S. clients.

Second, we ought to enact new tools to penalize tax haven banks that impede U.S. tax enforcement. Congress should give the Treasury Department authority to bar U.S. financial institutions from

[1] See Exhibit No. 104, which appears in the Appendix on page 564.



doing business with those banks, and the IRS should remove those banks from the Qualified Intermediary program, the QI program, that allows them to avoid disclosing the names of their non-U.S. clients to U.S. authorities.

Third, Congress should create a rebuttable presumption in enforcement proceedings that U.S. taxpayers who form or who send assets to or who receive assets from a legal entity in an offshore secrecy jurisdiction controls that entity and is, therefore, liable for taxation on its assets and income.

Fourth, Congress ought to change the law to require banks who know U.S. clients are behind the accounts opened in the name of offshore entities to treat those accounts as U.S. accounts that have to be disclosed to the IRS.

And we can do all that and more by enacting the Stop Tax Haven Abuse Act, a bill that I and Senator Coleman introduced last year.

Right now, tax haven banks and tax haven governments dress up their secrecy laws and banking practices with phrases like "financial privacy" and "wealth management." But secrecy breeds tax evasion. And secrecy hides not only the wrongdoers, but also those who aid and abet the wrongdoing. We are determined to tear down those secrecy walls in favor of transparency, cooperation, and tax compliance.

I want to thank my Ranking Member, Senator Coleman, and his staff for their support of this investigation and the legislation to stop tax haven abuses that we have introduced.

Senator Coleman.

## OPENING STATEMENT OF SENATOR COLEMAN

Senator COLEMAN. Thank you, Mr. Chairman.

This morning, we return to a matter that is important to all American taxpayers: The role of foreign banks—particularly those in offshore tax havens—in helping a disturbing number of wealthy Americans cheat on their taxes. At the outset, I want to express my appreciation to Senator Levin for his unwavering commitment throughout this effort. This has been a truly bipartisan investigation in every sense of the word. It would not have been possible to bring these important problems to light without your leadership, Mr. Chairman, and for that I thank you.

The problem we are confronting today is simple: Tens of thousands of America's wealthiest citizens are using offshore secrecy jurisdictions to hide trillions of dollars and avoid paying their fair share of taxes. The offshore problem remains one of staggering proportions. These tax havens hold an estimated $1.5 trillion in American assets, resulting in lost taxes of roughly $100 billion. That is three times the size of the Minnesota State budget general fund—lost because of dishonest individuals and entities exploiting the secrecy of foreign countries.

In doing so, these privileged few are forcing honest American taxpayers to bear a disproportionate burden of investing in crucial areas like health care, homeland security, and education. That tax loss sits like a millstone around the necks of honest American taxpayers, who are struggling with high taxes, ever-increasing gas prices, and rising health care costs.

# Tax Haven Bank Secrecy Tricks

- Code Names for Clients
- Pay Phones, not Business Phones
- Foreign Area Codes
- Undeclared Accounts
- Encrypted Computers
- Transfer Companies to Cover Tracks
- Foreign Shell Companies
- Fake Charitable Trusts
- Straw Man Settlors
- Captive Trustees
- Anonymous Wire Transfers
- Disguised Business Trips
- Counter-Surveillance Training
- Foreign Credit Cards
- Hold Mail
- Shred Files

Prepared by the U.S. Senate Permanent Subcommittee on Investigations, July 2008.

Permanent Subcommittee on Investigations
EXHIBIT #104



# Liechtenstein Secrecy Laws

**Article 14 of the Banking Act**: "The members of the organs of banks and their employees as well as other persons acting on behalf of such banks shall be obliged to maintain the secrecy of facts that they have been entrusted to or have been made available to them pursuant to their business relationships with clients. The obligation to maintain secrecy shall not be limited in time."

**Article 11 of the Trustee Act**: "Trustees are obliged to secrecy on the matters entrusted to them and of the facts which they have learned in the course of their professional capacity and whose confidentiality is in the best interest of their client. They shall have the right to such secrecy subject to the applicable rules of procedure in court proceedings and other proceedings before Government authorities."

**Article 10 – Data Confidentiality**: "Whoever processes data or has data processed must keep data from applications entrusted to him or made accessible to him based on his professional activities secret, notwithstanding other legal confidentiality obligations, unless lawful grounds exist for the transmission of the data entrusted or made accessible to him."

**Processing of Personal Data - § 1173a, Art. 28a ABGB (General Civil Code)**: "The employer may not process data relating to the employee unless such data concern his or her qualification for the employment or are indispensable for the performance of the employment contract. In addition, the provisions of the Data Protection Act shall apply."

**Article 8 – Transborder Data Flows** : "No personal data may be transferred abroad if the personal privacy of the persons affected could be seriously endangered, in particular where there is a failure to provide protection equivalent to that provided under Liechtenstein law. This shall not apply to states which are party to the EEA Agreement.; whoever wishes to transmit data abroad must notify the Data Protection Commissioner beforehand in cases where: a) there is no legal obligation to disclose the data and b) the persons affected have no knowledge of the transmission."

**Prohibited Acts of a Foreign State - Art. 2 of the Liechtenstein State Security Law**: "Prohibited Acts for a Foreign State: Whoever, without being authorized, performs acts for a foreign state on Liechtenstein territory that are reserved to an authority or an official, whoever aids and abets such acts, shall be punished by the Liechtenstein court (Landgericht) with imprisonment up to three years. "

**Prohibited Acts for a Foreign State – Art. 271 of the Swiss Penal Code**: "Whoever, without being authorized, performs acts for a foreign state on Swiss territory that are reserved to an authority or an official, whoever performs such acts for a foreign party or another foreign organization, whoever aids and abets such acts, shall be punished with imprisonment up to three years or a fine, in serious cases with imprisonment of no less than one year."

**Economic Intelligence Service (Art. 273 SPC)**: "Whoever seeks out a manufacturing or business secret in order to make it accessible to a foreign official agency, a foreign organization, a private enterprise, or their agents, whoever makes a manufacturing or business secret accessible to a foreign official agency, a foreign organization, a private enterprise, or their agents, shall be punished with imprisonment up to three years or a fine, in serious cases with imprisonment of no less than one year. Imprisonment and fine can be combined."

Prepared by the U.S. Senate Permanent Subcommittee on Investigations, July 2008.

Permanent Subcommittee on Investigations
EXHIBIT #105