# Exhibit H

# PREPARED TESTIMONY OF DOUG SHULMAN COMMISSIONER INTERNAL REVENUE SERVICE BEFORE THE SENATE COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS PERMANENT SUBCOMMITTEE ON INVESTIGATIONS MARCH 4, 2009

## Introduction

Mr. Chairman, Acting Ranking Member Coburn and Members of the Subcommittee, I want to thank you for the opportunity to testify today on the Internal Revenue Service's ongoing efforts to detect and stop unlawful offshore tax avoidance.

Mr. Chairman, international issues are a major strategic focus of the IRS. It is of paramount importance to our system of voluntary compliance with the tax law that citizens of this country have confidence that the system is fair. We cannot allow an environment to develop where wealthy individuals can go offshore and avoid paying taxes with impunity. As you will hear from my testimony today, the IRS is aggressively pursuing these individuals and institutions that facilitate unlawful tax avoidance.

These issues are so important to the agency that I have both increased the number of audits in this area over the last five months and prioritized stepped-up hiring of international experts and investigators. This occurred during a time when agency staffing levels were effectively frozen because of the Continuing Resolution.

While it is true that IRS agents and investigators will ultimately generate net enforcement revenues for the government, we view our international compliance strategy as much more focused on protecting the approximately $2.7 trillion base of revenue that the IRS collected in 2008 than the incremental enforcement revenue that we collect from these specific activities. We cannot allow corrosive behavior to undermine the fundamental fairness of our tax system.

Moreover, seen through the prism of the current economic crisis, it is egregious and scandalous that wealthy individuals continue hiding assets overseas and unlawfully avoiding US tax. It is an affront to the honest taxpayers of America, many of whom are struggling to pay their bills, who play by the rules and expect others to do the same.

## Specific Ongoing Cases

Mr. Chairman, I am fully aware that the intended focus of today's hearing is the specific facts and circumstances around a particular case of interest to the Subcommittee.

As an agency that takes pride in its enforcement record and our investigative results, there is nothing that would be more fulfilling than to discuss our investigations with the Subcommittee. Unfortunately, the IRS is unable to provide information to the Subcommittee on these specific ongoing cases. Because we do not arrive at this conclusion lightly, I offer the following explanation.

First, Section 6103 of the Internal Revenue Code generally prohibits the Internal Revenue Service from publicly disclosing information that could identify a specific taxpayer, and there is no exception for disclosing such information to this Subcommittee.

Additionally, because the Subcommittee is inquiring on matters that have yet to be adjudicated, public commentary by the IRS officials on these matters could unnecessarily create risk to the government's case. Therefore as a matter of policy, the IRS cannot comment on these cases.

Although I cannot discuss the specifics of the case, I have attached to my testimony the summons in question, which is a matter of public record, and contains the legal basis of the case.

**IRS Enforcement: Tightening the Net**

There is general agreement in the tax administration community that there is no "silver bullet" or one strategy that will alone solve the problems of offshore tax avoidance. If such a solution existed, it would have been implemented a long time ago. Rather, an integrated approach is needed, made up of separate but complementary programs that will tighten the net around these tax cheats.

As previously noted, the IRS has taken an aggressive and focused approach to international tax compliance that has included increasing its resources in this area by hiring specialists devoted strictly to this international effort. We also have a number of important enforcement tools that are described in greater detail below.

***International Collaboration***

International collaboration is essential in the fight against offshore tax avoidance. On this topic there is clear consensus among our closest economic partners.

To help stem the tide of tax evasion, the United States currently has tax treaties and cooperative tax information exchange agreements (TIEAs) with over 70 jurisdictions. We continue to expand the number of countries with which we have agreements and to renegotiate agreements to improve information exchange. However, in some instances the process to obtain names of account holders is inefficient, and in those cases we use other legal and investigative techniques described below.

The Joint International Tax Shelter Information Center – or JITSIC – has also proved to be another important arrow in our quiver. JITSIC's primary focus has been on the

bilateral exchange of specific abusive transactions and their promoters and investors. The results, to date, have been promising. The U.S. has received information regarding transactions of which it had not been previously aware.

Indeed, in light of the complexity of the transactions, and considering the inherent difficulty normally associated with obtaining taxpayer-specific shelter information from foreign countries, it is unlikely that these transactions would have been uncovered and understood, but for JITSIC.

We need to redouble our commitment to international cooperation, and explore new and different ways to work with our counterparts overseas. Of direct relevance to today's discussion, we recently announced plans to build upon the initial success of JITSIC to specifically focus on international cooperation to combat offshore tax avoidance.

***Qualified Intermediary Program (QI)***

In detecting and attacking unreported off-shore accounts, we have a combination of tools at our disposal – all of which we are using simultaneously.

One of our best is the Qualified Intermediary program. The QI program gives the IRS an important line of sight into the activities of foreign banks and other financial institutions. It also provides information reporting that the IRS did not receive before this program was implemented. Most major financial institutions worldwide are QI participants, although a large number of smaller financial institutions do not participate in the program.

The QI system is an opt-in system that encourages foreign investment in the US by allowing foreign banks to deal on an aggregate basis with US withholding agents for all of their foreign customers investing in US securities. In exchange for QI status, the bank must follow detailed documentation procedures to ensure that the IRS receives information about their US customers investing in US securities.

Indeed, the QI program is critical to facilitating sound tax administration in a global economy. By bringing foreign financial institutions more directly into the U.S. tax information reporting system, we can better ensure that U.S. persons are properly paying U.S. tax, and that foreign persons are subject to the proper U.S. withholding tax rates.

Nonetheless, there are issues in the QI program that must be addressed. We need to shore up the QI program and enhance, improve and strengthen it. And we are.

In mid-October 2008, we issued a set of proposed QI amendments for comment which we believe will make QI audits more useful and help give us a clearer line of vision and transparency that we need in tax administration. Under the proposed changes, financial institutions that are QIs must provide early notification of material failure of internal controls. They must also improve evaluation of risk of circumvention of U.S. taxation by U.S. persons. And they must include audit oversight by a U.S. auditor.

The IRS and Treasury Department are also considering additional changes to the QI program to expand the information reporting required for U.S. customers holding accounts overseas, which I will describe later in my testimony.

***Whistleblowers/John Doe Summons/Criminal Investigation***

Informants are another part of IRS' enforcement net. Since the inception of the Whistleblower Office in 2007, the IRS has received hundreds of tips on financial institutions and individuals with foreign accounts and international compliance issues. Some of these have become significant cases.

Dozens of these tips involve the names of individuals with offshore accounts; others involve the names and practices of financial institutions in those countries that typically have strict bank secrecy laws.

And keep in mind that the value here is far greater than just the names of specific individuals. With additional development, these tips provide information that can lead to a John Doe summons – our next important tool.

The IRS generally uses the John Doe summons authority to identify individuals, groups or classes of US taxpayers: (1) whose member identities are unknown; (2) who may be involved in specific areas of tax noncompliance; and (3) who cannot be identified through other means.

For example, we would employ this type of summons when we strongly suspect US taxpayers are using offshore bank accounts to avoid paying taxes, but do not know their identities.

While the John Doe summons is a powerful tool in the civil arena, the IRS has also deployed significant resources to criminal tax investigations. The IRS is increasing its resources devoted to investigating the misuse of foreign entities and the use of foreign bank accounts to hide taxable income and is currently pursuing hundreds of criminal leads involving U.S. taxpayers potentially involved in offshore tax evasion.

The IRS has established a group of Criminal Investigation agents that focuses solely on international matters. As a part of this effort, the IRS participates in an interagency team led by the Department of Justice to review suspicious activity reports focusing on individuals and businesses based in foreign countries.

Another group of IRS Criminal Investigation agents on the West Coast focuses on international matters that arise on the Pacific Rim. This project is part of a long-term strategy for enhancing bilateral law enforcement cooperation to combat offshore tax evasion, money laundering, and related financial crimes.

In FY 2008, IRS-developed cases related to foreign and offshore issues resulted in 61 criminal convictions, and the average term for those going to jail was 32 months. For the

first fourth months of FY 2009, there were 20 convictions, and the average jail term was 84 months.

**Effect of IRS Actions on Offshore Tax Avoidance**

In recent months and years, the IRS has concluded a number of significant cases where U.S. citizens have been caught attempting to hide assets and income overseas.

A much less quantifiable, but no less certain effect has been the creation of an environment in which offshore tax evaders fear detection and prosecution.

The tax evader on the run is especially vulnerable. Every instance where that individual withdraws or moves money creates a paper trial. That is because foreign banks are providing new information to the IRS or the IRS is investigating similarly situated taxpayers. This generates greater scrutiny of the transaction and increases the potential for suspicious activity to be spotted.

These actions also create greater legal jeopardy for those who break cover. Once these activities occur, it is far more likely that the IRS will uncover them through whistleblowers, other non-tax related investigations or through JITSIC and our treaty partners.

I would be remiss if I did not take this opportunity to directly address those that may have undeclared offshore accounts and income, wondering what they should do. I would advise anyone in this situation to come in, and get right with your government as soon as possible. Under long-standing IRS policy, taxpayers who voluntarily disclose in most cases avoid criminal prosecution. You will certainly suffer the appropriate economic consequences, but in most cases you will no longer have to play the lottery with your freedom and livelihood.

To the extent that anyone – even those with experience in this area – advises you to wait it out, I would suggest that this advice is misguided at best and foolish at worst. The IRS is entering a time of unprecedented focus on offshore tax evasion.

In the first four months of FY 2009, the IRS has already seen a significant increase in the number of voluntary disclosures that we have received compared to the same period last year.

**Next Steps**

Mr. Chairman, while tangible progress has been made to combat offshore tax evasion, our experience shows that there are areas where improvements can be made. I am pleased to discuss several proposals that we are currently considering to improve our existing administrative programs.

I can also tell you that offshore issues are high priority to the President and his Administration. The President's budget committed to identifying $210 billion in savings

over the next decade from international enforcement, reforming deferral and other tax reform policies. The Administration will have more detailed and specific announcements in this area in the near future.

For today's hearing, I wanted to focus on some areas affecting offshore issues. I would like to start with some changes we are considering in the QI program.

Some measures that the IRS and Treasury Department are considering include:

- Expanding information reporting requirements to include more sources of income for US persons with accounts at QI banks
- Strengthening documentation rules to ensure that the program is delivering on its original intent
- Requiring withholding for accounts with documentation that is considered insufficient

Additionally, the IRS has already proposed changes that would shore up the independent review of the QI program in substantial ways. This proposal is currently out for comment, and the IRS looks forward to reviewing these comments.

As you can see, the IRS and Treasury Department are considering a wide range of measures to ensure that the QI program is working as intended. However, there will always be instances where the IRS discovers a potential violation of the tax law after the fact. In these cases, there may administrative and legislative changes that may be helpful to the IRS as we investigate potential wrongdoing.

For example, Secretary Geithner committed during his confirmation process to examine a number of policy options, including changing the presumption for transactions in tax-secrecy jurisdictions and other ideas included in your legislation.

Finally, as you know, in past testimony we have stated that in cases involving offshore bank and investment accounts located in bank secrecy jurisdictions, it would be helpful for Congress to extend the time to assess a tax liability with respect to offshore issues from three years to six years.

**Conclusion**

Mr. Chairman, I want to thank you for this opportunity to provide an update on IRS' activities to combat illegal tax avoidance schemes relating to offshore accounts and transactions. Because this is a global problem, it will require a closely coordinated strategy among nations dedicated to ending this scourge that deprives our country of precious resources and erodes confidence in the fairness of effectiveness of our tax administration system. I would be happy to respond to your questions.